**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| JUI CHENG HSIAO, Derivatively on Behalf of Nominal Defendant GLOBE LIFE INC. f/k/a TORCHMARK CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> GARY L. COLEMAN, LARRY M. HUTCHISON, FRANK M. SVOBODA, M. SHANE HENRIE, JAMES MATTHEW DARDEN, THOMAS P. KALMBACH, CHARLES E. ADAIR, LINDA L. ADDISON, MARILYN A. ALEXANDER, CHERYL D. ALSTON, JANE M. BUCHAN, ROBERT W. INGRAM, STEVEN P. JOHNSON, DARREN M. REBELEZ, MARY E. THIGPEN, MARK A. BLINN, JAMES P. BRANNEN, ALICE S. CHO, DAVID A. RODRIGUEZ, <br><br> Defendants, <br><br> and <br><br> GLOBE LIFE INC. f/k/a TORCHMARK CORPORATION, <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Jui Cheng Hsiao ("Plaintiff"), by and through Plaintiff's undersigned attorneys, brings this derivative complaint for the benefit of Nominal Defendant, Globe Life Inc. f/k/a Torchmark Corporation[1] ("Globe Life" or the "Company"), against its Board of Directors (the

---

[1] As of August 8, 2019, the Company changed its name from Torchmark Corporation to Globe Life Inc.

"Board") and certain of its executive officers seeking to remedy Defendants' breaches of fiduciary duties. Plaintiff's allegations are based upon his personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Globe Life with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    Globe Life is an insurance holding company that, through its subsidiaries, provides various life and supplemental health insurance to lower middle to middle-income households throughout the U.S. Globe Life primarily operates through five wholly-owned subsidiaries, one of which is American Income Life Insurance Company ("AILIC").

2.    AILIC is the largest of Globe Life's subsidiaries. For fiscal year 2023, AILIC's agent count exceeded 10,500, and it contributed 50% of Globe Life's underwriting margin, which is the measure of profitability used by Globe Life management.

3.    For at least four years, the Company consistently reported artificially inflated profitability metrics for Globe Life, and particularly its AILIC subsidiary. These metrics were inflated because, over that time period, AILIC was engaging in widespread insurance and recruiting fraud. Instead of disclosing these issues, the Individual Defendants (defined below) attributed the Company's financial success to increased agent count, policy persistency, and high sales. Moreover, during this time period, the subsidiary was knowingly providing or ignoring unsafe working environments for its female employees.

4.    The truth emerged on April 11, 2024, when Fuzzy Panda Research published a report alleging that it "uncovered extensive allegations of insurance fraud ignored by management

despite being obvious and reported hundreds of times." (Emphasis in original).  The report detailed that AILIC appeared to be an illegal pyramid scheme making it more profitable for insurance agents to recruit new agents than to sell insurance policies.  The report described unsafe working environments permitted and, in some instances, perpetrated by Company management, leading to instances of sexual harassment and sexual assault of subordinates.  On this news, the Company's stock price fell approximately 53% to close at $49.17 per share on April 11, 2024, on unusually heavy trading volume.

5.    These revelations precipitated the filing of a securities class action in this District against Globe Life and certain of the defendants named herein, captioned *City of Miami Gen. Emples' & Sanitation Emples.' Ret. Trust v. Globe Life Inc. f/k/a Torchmark Corp., et al.*, Case No.  (the "Securities Class Action").

6.    Plaintiff did not make a litigation demand prior to filing this action because such action would have been futile based upon the composition of the Board and the actions taken by the Board, as alleged herein.

## II.    JURISDICTION AND VENUE

7.    This Court has original jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332.  Subject matter jurisdiction is proper because the amount in controversy exceeds $75,000, exclusive of interest and cost, and the named Plaintiff is a citizen of Taiwan and Defendants are citizens of the United States.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.    This Court may exercise personal jurisdiction over the Individual Defendants (defined herein) because Globe Life is headquartered in this District.

9.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because: (i) Globe Life is headquartered in this District; (ii) a substantial portion of the transactions and

wrongs complained of herein occurred in this jurisdiction; and (iii) the Individual Defendants (defined herein) have received substantial compensation in this District by doing business here and engaging in numerous activities that have had an effect in this District

## III.    PARTIES

**Plaintiff**

10.    Plaintiff Jui Cheng Hsiao has continuously owned Globe Life stock during the wrongdoing alleged herein.  Plaintiff is a citizen of Taiwan.

**Nominal Defendant**

11.    Nominal Defendant Globe Life is a Delaware corporation with its principal executive offices located at 3700 South Stonebridge Drive, McKinney, Texas 75070.  Its common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GL."

**Defendants**

12.    Defendant Gary L. Coleman ("Coleman") served as a co-Chief Executive Officer ("CEO") of the Company from June 2012 until December 2022.  He also served as a director of the Company from August 2012 until April 2023, and as co-Chairman of the Board from April 2014 until April 2023.  He is a citizen of Texas.

13.    Defendant Larry M. Hutchison ("Hutchison") served as a co-CEO of the Company from June 2012 until December 2022.  He also served as a director of the Company from August 2012 until April 2023, and as co-Chairman of the Board from April 2014 until April 2023.  He is a citizen of Texas.

14.    Defendant Frank M. Svoboda ("Svoboda") has served as the Company's co-CEO since January 2023, and as a director of the Company since April 2023.  Previously, he served as Executive Vice President ("EVP") and Chief Financial Officer ("CFO") of the Company from June 2012 until January 2023.  He is a citizen of Texas.

15.     Defendant M. Shane Henrie ("Henrie") has served as the Corporate Senior Vice President ("SVP") and Chief Accounting Officer ("CAO") of the Company since January 2023. He is a citizen of Texas.

16.     Defendant James Matthew Darden ("Darden") has served as the Company's co-CEO since January 2023, and as a director of the Company since April 2023.  He is a citizen of Texas.

17.     Defendant Thomas P. Kalmbach ("Kalmbach") has served as the Company's CFO and as one of its Vice Presidents since January 2023.  He is a citizen of Texas.

18.     Defendant Charles E. Adair ("Adair") served as a director of the Company from April 2003 until April 2022.  He is a citizen of Alabama.

19.     Defendant Linda L. Addison ("Addison") has served as a director of the Company since February 2018.  She is a citizen of Texas.

20.     Defendant Marilyn A. Alexander ("Alexander") has served as a director of the Company since February 2013.  She is a citizen of California.

21.     Defendant Cheryl D. Alston ("Alston") has served as a director of the Company since February 2018.  She is a citizen of Texas.

22.     Defendant Jane M. Buchan ("Buchan") served as a director of the Company from October 2005 until April 2024.  She is a citizen of California.

23.     Defendant Robert W. Ingram ("Ingram") served as a director of the Company from October 2005 until April 2023.  He is a citizen of Texas.

24.     Defendant Steven P. Johnson ("Johnson") has served as a director of the Company since November 2016.  He is a citizen of Texas.

25.     Defendant Darren M. Rebelez ("Rebelez") served as a director of the Company from February 2010 until April 2023.  He is a citizen of Iowa.

26.     Defendant Mary E. Thigpen ("Thigpen") has served as a director of the Company since February 2018.  She is a citizen of Georgia.

27.     Defendant Mark A. Blinn ("Blinn") has served as a director of the Company since November 2021.  He is a citizen of Texas.

28.     Defendant James P. Brannen ("Brannen") has served as a director of the Company since November 2021.  He is a citizen of Iowa.

29.     Defendant Alice S. Cho ("Cho") has served as a director of the Company since February 2023.  She is a citizen of California.

30.     Defendant David A. Rodriguez ("Rodriguez") has served as a director of the Company since February 2023.  He is a citizen of Maryland.

31.     Defendants Coleman, Hutchison, Svoboda, Henrie, Darden, Kalmbach, Adair, Addison, Alexander, Alston, Buchan, Ingram, Johnson, Rebelez, Thigpen, Blinn, Brannen, Cho, and Rodriguez are sometimes referred to hereinafter as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers, directors, and/or fiduciaries of Globe Life and because of their ability to control the business and corporate affairs of Globe Life, at all relevant times, the Individual Defendants owed Globe Life and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Globe Life in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Globe Life and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.  Each director and officer of the Company owes to Globe Life and its

stockholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Globe Life, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Globe Life, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

34.    To discharge their duties, the officers and directors of Globe Life were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Globe Life were required to, among other things:

(a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)    Exercise good faith to ensure that the Company operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    Exercise good faith to ensure that the Company's communications with the public and with stockholders are made with due candor in a timely and complete fashion; and

(d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

35.    The Individual Defendants, as current or former directors and/or officers of Globe Life, are or were required to abide by Globe Life's Code of Conduct.  The Code of Conduct "expresses the standards of integrity and business conduct that every Company employee,

contractor, officer, and director must uphold and follow" and that the Code of Conduct "has been formally adopted by the Boards of Directors of Globe Life Inc. and each of its subsidiaries."  The Individual Defendants were "expected to understand, respect and comply, in letter and spirit, with all of the laws, rules, and regulations that apply to them in their respective positions at the Company."

36.    The Code of Conduct represents that the Individual Defendants are dedicated to providing a safe working environment for Globe Life employees, stating that "[t]he Company is committed to providing an inclusive and welcoming environment" and "to ensuring that employment, promotion, and workplace advancement decisions are based on the individual's abilities and qualifications."  The Code of Conduct establishes that "[v]iolence and threatening behavior are not permitted" and that "[t]he use of illegal drugs in the workplace will not be tolerated."

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

37.    Globe Life is an insurance holding company that, through its subsidiaries, provides various life and supplemental health insurance to lower middle to middle-income households throughout the U.S.  Globe Life primarily operates through five wholly-owned subsidiaries, one of which is AILIC.

38.    AILIC is the largest of Globe Life's subsidiaries.  For fiscal year 2023, AILIC's agent count exceeded 10,500, and it contributed 50% of Globe Life's underwriting margin, which is the measure of profitability used by Globe Life management.

39.    Globe Life agents are compensated based on the number of life insurance policies each is able to sell.  Between May 2019 and April 2024, Globe Life substantially modified how compensation was paid to its agents.  Instead of paying out commission bonuses at year's end,

Globe Life began paying out commission bonuses in agents' paychecks immediately subsequent to the sale of insurance policies.  Additionally, Globe Life implemented a claw back policy, pursuant to which agents were required to reimburse the Company for any bonuses received in connection with policies cancelled within a certain number of months.

> **B.    The Individual Defendants Caused Globe Life to Issue Materially Misleading Statements Concerning the Company's Financials**

40.    On May 7, 2019, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended March 31, 2019 ("1Q19 Report").  The 10-Q was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda attesting to the purported accuracy and completeness of the 10-Q.

41.    The 1Q19 Report stated that "[t]otal premium income rose 5% for the three months ended March 31, 2019 to $891 million."  Total net sales increased 4% to $144 million . . . [t]otal first-year collected premium was $118 million." Moreover, the 1Q19 stated that "[l]ife insurance premium income increased 4% to $624 million over the prior year total of $598 million. Life net sales rose 4% to $105 million for the three month period of 2019. First-year collected life premium rose 2% to $81 million . . . [u]nderwriting income increased to $170 million for the first three months of 2019, 10% over the same period in 2018."  The 1Q19 Report disclosed life insurance premiums by distribution channel, and reported that AILIC generated nearly $282 million in life insurance premiums, and made up 45% of the Company's 2019 year-to-date total life premiums, a 7% increase over the prior year.  The report also disclosed net sales by distribution channel and represented that AILIC had over $57.5 million in net sales, making up 54% of the Company's total net sales.  The 1Q19 Report also reported first year collected premiums by distribution channel

and represented that AILIC had nearly $47.5 million in first year collected premiums, making up 58% of the Company's total first year collected premiums.

42.    On July 25, 2019, Globe Life held its earnings call to discuss the Company's financial results for the second quarter of 2019, during which Defendant Coleman stated "[i]n our life insurance operations, premium revenue increased 5% to $631 million; and life underwriting margin was $175 million, up 9% from a year ago." Also during the earnings call, Defendant Hutchison stated, "[a]t [AILIC], life premiums were up 7% to $288 million and life underwriting margin was up 9% to $97 million. Net life sales were $61 million, up 2%."

43.    On August 8, 2019, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended June 30, 2019 ("2Q19 Report").  The 2Q19 Report was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda attesting to the purported accuracy and completeness of the report.  The report stated that, for the second quarter of 2019, Globe Life's life insurance premium revenue was $631 million.  For AILIC specifically, Globe Life reported that "during the six months ended June 30, 2019 . . . [n]et sales increased 3% to $119 million in 2019 over the 2018 total of $115 million."

44.    On August 30, 2019, the Individual Defendants caused the Company to publish its Environmental, Social & Governance ("ESG") Report for 2018 ("2018 ESG Report").  In the 2018 ESG Report, Globe Life stated, "[o]ur Code of Conduct expresses the standards of integrity and business conduct that every company employee, contractor, officer and director must uphold and follow" and that "[t]he Company is committed to providing an inclusive and welcoming environment for all members and our community."  The 2018 ESG Report further stated, in relevant part:

Non-Discrimination and Anti-Harassment Policy: Globe Life is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits discriminatory practices, including harassment. Therefore, Globe Life expects that all relationships among persons in the workplace will be professional and free of bias, prejudice and harassment.

45.     On October 24, 2019, Globe Life held its earnings call to discuss the Company's financial results for the third quarter of 2019, during which Defendant Coleman stated that "[i]n [Globe Life's] Life insurance operations, premium revenue increased 4% to $631 million, and life underwriting margin was $181 million, up 8% from a year ago. Growth in underwriting margin exceeded premium growth due to higher margin percentages in all distribution channels." Additionally, Defendant Hutchison stated, "[a]t [AILIC], life premiums were up 7% to $293 million; and life underwriting margin was up 9% to $100 million. Net life sales were $60 million, up 9%. The sales growth was driven primarily by agent count growth."

46.     On November 12, 2019, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended September 30, 2019 ("3Q19 Report"). The 3Q19 Report was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q. The report stated that, for the third quarter of 2019, Globe Life's life insurance premium revenue was $631 million. For AILIC specifically, for the nine-month period ended September 30, 2019, AILIC's "net sales increased 5% to $178 million in 2019 over the 2018 total of $169 million."

47.     On February 5, 2020, Globe Life held its earnings call to discuss the Company's financial results for fourth quarter and full year 2019, during which Defendant Coleman stated, "[i]n our Life Insurance operations, premium revenue increased 5% to $631 million and life underwriting margin was $177 [million], up 6% from a year ago." Additionally, Defendant

Hutchison stated, "[a]t [AILIC], life premiums were up 8% to $297 million and life underwriting margin was up 9% to $98 million. Net life sales were $59 million, up 9%[, and] . . . [n]et life sales for the full year 2019 grew 6%. The sales increase was driven by increases in agent count."

48.    On February 27, 2020, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC for the reporting period ended December 31, 2019 ("2019 10-K").  The 2019 10-K was signed by Defendants Coleman, Hutchison, Svoboda, Henrie, Adair, Addison, Alexander, Alston, Buchan, Ingram, Johnson, Rebelez, and Thigpen.  The annual report stated that, for full year 2019, Globe Life's life insurance underwriting margin was $703 million, while total net sales increased 6% to $621 million, when compared to the same period in 2018.  For AILIC specifically, Globe Life stated that, for full year 2019, AILIC's life insurance "[n]et sales increased to $238 million in 2019 over the 2018 total of $224 million."

49.    On April 23, 2020, Globe Life held its earnings call to discuss the Company's financial results for the first quarter of 2020, during which Defendant Coleman stated "[i]n our life insurance operations, premium revenue increased 4% to $650 million, and life underwriting margin was $179 million, up 5% from a year ago."

50.    On May 7, 2020, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended March 31, 2020 ("1Q20 Report").  The 1Q20 Report was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the report.  The 1Q20 Report stated, for the first quarter of 2020, Globe Life's life premium was $649.6 million, while the Company's life insurance underwriting margin was $179 million.  For AILIC specifically, for the first quarter of 2020,

AILIC's life insurance premium revenue was $302 million, and "[n]et sales increased 9% to $63 million in 2020 over the 2019 total of $58 million."

51.     On July 23, 2020, Globe Life held its earnings call to discuss the Company's financial results for the second quarter of 2020, during which Defendant Coleman stated "[i]n life insurance operations, premium revenue increased 6% to $671 million[.] . . . With respect to the premium revenue, we've been very pleased to see the persistency and premium collections improved since the onset of the [Covid-19] crisis."  Additionally, Defendant Hutchison stated, "[a]t [AILIC], life premiums were up 7% to $309 million . . . [and] while life sales were down for the quarter, we have seen an increase in agent[s] and activity. The rise in activity is not reflected in the second quarter sales where the increased time for policies to be issued resulting from changes in our underwriting procedures."

52.     On August 6, 2020, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended June 30, 2020 ("2Q20 Report").  The 2Q20 Report was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the report.  The report stated that, for the second quarter of 2020, Globe Life's life premium revenue was $670 million.  For AILIC specifically, for the six-month period ended June 30, 2020, AILIC's life insurance premium revenue was $612 million, and "[n]et sales declined 4% to $114 million during the first six months of 2020 over the 2019 total for the same period of $119 million."

53.     On October 9, 2020, the Individual Defendants caused the Company to publish its ESG Report for 2019 ("2019 ESG Report").  Similarly to the 2018 ESG Report, the 2019 ESG Report stated that the "Code of Conduct expresses the standards of integrity and business conduct

that every employee, contractor, officer, and director must uphold and follow." The 2019 ESG Report also stated that "all employees are required to take annual training on our Code of Conduct." Additionally, the 2019 ESG Report stated that "[v]iolence and threatening behavior are not permitted." The 2019 ESG Report also included a link to Globe Life's Code of Conduct, thereby incorporating by reference the Company's Code of Conduct.[2]

54.    On October 22, 2020, Globe Life held its earnings call to discuss the Company's financial results for the third quarter of 2020, during which Defendant Coleman stated that "[i]n our life insurance operations, premium revenue increased 7% to $674 million[.] . . . With respect to the premium revenue, we've been pleased to see the persistency and premium collections improved since the onset of the [Covid-19] crisis." Additionally, Defendant Hutchison stated that, "[a]t [AILIC], life premiums were up 9% to $319 million [and] . . . net life sales were $68 million, up 14%. The increase in net life sales is primarily due to increased agent count."

55.    On November 5, 2020, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended September 30, 2020 ("3Q20 Report"). The 3Q20 Report was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q. That report stated that, for the third quarter of 2020, Globe Life's life insurance premium revenue was $674 million, and for the nine-month period ended September 30, 2020, Globe Life's life insurance underwriting margin was $511

---

[2] On September 3, 2021, the Individual Defendants caused the Company to publish its ESG Report for 2020 ("2020 ESG Report"). On April 15, 2022, the Individual Defendants caused the Company to publish its ESG Report for 2021 ("2021 ESG Report"). Each of the ESG reports contains statements concerning the Company's Code of Conduct that are substantially similar to those statements made in the 2019 ESG Report. Each report also incorporates by reference the Code of Conduct.

million.  For AILIC specifically, Globe Life reported, for the nine-month period ended September 30, 2020, AILIC's life insurance premium was $930 million, and "[n]et sales increased 2% to $182 million during the first nine months of 2020 over the 2019 total for the same period of $178 million."

56.    On February 3, 2021, Globe Life held its earnings call to discuss the Company's financial results for fourth quarter and full year 2020, during which Defendant Coleman stated that "[i]n our life insurance operations, premium revenue increased 7% to $678 million. As noted before, we have seen improved persistency and premium collections since the onset of the [Covid-19] crisis." Additionally, Defendant Hutchison stated that "[a]t [AILIC], life premiums were up 10% to $327 million, and life underwriting margin was up 7% to $105 million. Net life sales were $71 million, up 20%. The increase in net life sales is primarily due to increased agent count."

57.    On February 25, 2021, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC for the reporting period ended December 31, 2020 ("2020 10-K").  The 2020 10-K was signed by Defendants Coleman, Hutchison, Svoboda, Henrie, Adair, Addison, Alexander, Alston, Buchan, Ingram, Johnson, Rebelez, and Thigpen.  The annual report stated that, for full year 2020, Globe Life's "[t]otal net sales increased 7% over the same period in the prior year from $621 million to $662 million," while its life insurance underwriting margin was $675 million. For AILIC specifically, Globe Life reported, for the year ending 2020, AILIC's life insurance premium was $1.3 billion, and " [n]et sales increased 7% to $253 million in 2020 over the 2019 total of $238 million."

58.    On April 22, 2021, Globe Life held its earnings call to discuss the Company's financial results for the first quarter of 2021, during which Defendant Coleman stated that "[i]n the life insurance operations, premium revenue increased 9% to $708 million."  Additionally,

Defendant Hutchison stated, "[a]t [AILIC], life premiums were up 11% to $335 million . . . Net life sales were $70 million, up 11%. The increase in net life sales is primarily due to increased agent count."

59.     On May 6, 2021, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended March 31, 2021 ("1Q21 Report").  The 1Q19 Report was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  The 1Q19 Report stated, for the first quarter of 2019, Globe Life's life insurance premium revenue was $708 million, and that, when comparing first quarter 2021 with the same period in 2020, "life premium increased 9% for the period from $650 million in 2020 to $708 million in 2021."  For AILIC specifically, Globe Life reported that, for the first quarter of 2021, AILIC's life insurance premium revenue was $335 million, and "[n]et sales increased 11% to $70 million during the first three months of 2021 over the 2020 total for the same period of $63 million."

60.     On July 22, 2021, Globe Life held its earnings call to discuss the Company's financial results for the second quarter of 2021, during which Defendant Coleman stated that "[i]n our life insurance operations, premium revenue increased 9% from the year ago quarter to $728 million. . . . Life underwriting margin was $179 million, up 11% from a year ago. The increase in margin is due primarily to the higher premium and lower amortization related to the improved persistency."  Additionally, Defendant Hutchison stated that "[a]t [AILIC], life premiums were up 13% over the year-ago quarter to $348 million and life underwriting margin was up 16% to $108 million.  The higher underwriting margin is primarily due to improved persistency and higher sales

in quarters. . . . In the second quarter of 2021 net life sales were $73 million, up 42%. The increase in net life sales is primarily due to increased agent count and productivity."

61.    On August 5, 2021, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended June 30, 2021 ("2Q21 Report").  The 2Q21 Report was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the report. The 2Q21 Report stated, for the second quarter of 2021, Globe Life's life insurance premium revenue was $728 million, and for the six-month period ended June 30, 2021, "[t]otal net sales increased 15% to $347 million, when compared with the same period in 2020."  For AILIC specifically, Globe Life reported, for the six-month period ended Juned 30, 2021, AILIC's life insurance premiums were $683 million, and "[n]et sales increased 25% to $143 million during the first six months of 2021 over the 2020 total for the same period of $114 million."

62.    On October 21, 2021, Globe Life held its earnings call to discuss the Company's financial results for the third quarter of 2021, during which Defendant Coleman stated " "[i]n our life insurance operations, as we've noted before, we have seen improved persistency since the onset of the pandemic. In the third quarter, life premium revenue increased 8% from a year ago to $729 million." Additionally, Defendant Hutchison stated that "[a]t [AILIC], life premiums were up 12% over the year-ago quarter to $356 million, and life underwriting margin was up 11% to $111 million. The higher underwriting margin is primarily due to improved persistency and higher sales in recent quarters. In the third quarter of 2021, net life sales were $74 million, up 9%. The increase in net life sales is primarily due to increased agent count."

63.     On November 4, 2021, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended September 30, 2021 ("3Q21 Report").  The 3Q21 Report was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  The report stated, for the third quarter of 2021, Globe Life's life insurance premium revenue was $729 million, and for the nine-month period ended September 30, 2021, "[t]otal net sales increased 9% to $518 million, when compared with the same period in 2020."  For AILIC specifically, Globe Life reported, for the nine-month period ended September 30, 2021, AILIC's life insurance premiums were $1.03 billion, and that "[n]et sales increased 19% to $217 million during the first nine months of 2021 compared with $182 million in 2020 for the same period."

64.     On February 3, 2022, Globe Life held its earnings call to discuss the Company's financial results for fourth quarter and full year 2021, during which Defendant Coleman stated that "[i]n our life insurance operations, we continue to see improved persistency compared to pre-pandemic levels. In the fourth quarter, premium revenue increased 8% from a year ago to $733 million."  Additionally, Defendant Hutchison stated that "[a]t [AILIC], life premiums were up 11% over the year ago quarter to $364 million[.] . . . The higher premium is primarily due to improved persistency and higher sales in recent quarters. In the fourth quarter of 2021, net life sales were $74 million, up 4%. The increase in net life sales is due to increased productivity."

65.     On February 24, 2022, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC for the reporting period ended December 31, 2021 ("2021 10-K").  The 2021 10-K was signed by Defendants Coleman, Hutchison, Svoboda, Henrie, Adair, Addison, Alexander, Alston, Blinn, Brannen, Buchan, Ingram, Johnson, Rebelez, and

Thigpen.  The annual report stated that, for full year 2021, Globe Life's "[l]ife premium increased 8% for the period from $2.7 billion in 2020 to $2.9 billion in 2021." For full year 2021, Globe Life reported a life insurance underwriting margin of $624 million.  For AILIC specifically, Globe Life stated, for full year 2021, AILIC's life insurance premium revenue was $1.4 billion, and "[n]et sales increased 15% to $291 million in 2021 over the 2020 total of $253 million. The increase in net life sales is due to increased productivity and [*sic*] well as an increase in agent count."

66.    On April 21, 2022, Globe Life held its earnings call to discuss the Company's financial results for the first quarter of 2022, during which Defendant Coleman stated "[i]n our life insurance operations, premium revenue increased 7% from a year ago to $755 million. Life underwriting margin was $150 million, up 10% from a year ago. The increase in margin is due primarily to increased premium."  Additionally, Defendant Hutchison stated that "[a]t [AILIC], premiums were up 10% over the year-ago quarter to $370 million, and life underwriting margin was up 13% to $111 million. The higher premium is primarily due to higher sales in recent quarters. In the first quarter of 2022, net life sales were $85 million, up 23%. The increase net life sales is [partially] due to increased productivity."

67.    On May 6, 2022, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended March 31, 2022 ("1Q22 Report").  The 1Q22 Report was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the report.  The 1Q22 Report stated that, for the first quarter of 2022, Globe Life's life insurance premium revenue was $755 million, and "[t]otal net sales increased 8% to $182 million, when compared with 2021."  For AILIC specifically, Globe Life reported that, for the first quarter of 2022, AILIC's life insurance premium revenue was  $370

million, and "[n]et sales increased 23% to $85 million during the first three months of 2022 compared with $70 million in 2021 for the same period."

68.    On July 28, 2022, Globe Life held its earnings call to discuss the Company's financial results for the second quarter of 2022, during which Defendant Coleman stated that "[i]n life insurance operations, premium revenue increased 4% from the year-ago quarter to $760 million. Life underwriting margin was $198 million, up 11% from a year ago. The increase in margin is due primarily to increased premium."  Additionally, Defendant Hutchison stated that "[a]t [AILIC], life premiums were up 8% over the year-ago quarter to $376 million, and life underwriting margin was up 19% to $128 million. . . . In the second quarter of 2022, net life sales were $85 million, up 16%."

69.    During the Q&A portion of the second quarter 2022 earnings call, Defendant Coleman responded to a question concerning policy persistency, stating that "it's reasonable to think that inflation could be affecting persistency" as well as "the end of the government COVID relief payments[,] . . . [which put] less income in the hands of our policyholders. That could have an impact. And also, we think we're seeing a little bit of impact of some insure[d]s feeling like they no longer need the coverage."  Defendant Coleman concluded by stating  that he "want[s] to emphasize that we're not concerned about having adverse persistency," and that, "at this point, we do not see anything to indicate that that's going to be an ongoing increase in lapses."

70.    On August 5, 2022, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended June 30, 2022 ("2Q22 Report").  The 2Q22 Report was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the 10-Q.  The report stated, for the second quarter of

2022, Globe Life's life insurance premium revenue was $760 million, and that, for the six-month period ended June 30, 2022, "[t]otal net sales increased 5% to $366 million, when compared with 2021." For AILIC specifically, Globe Life stated, for the six-month period ended June 30, 2022, AILIC's life insurance premium revenue was $746 million, and "[n]et sales increased 19% to $171 million during the first six months of 2022 compared with $143 million in 2021 for the same period."

71.     On October 27, 2022, Globe Life held its earnings call to discuss the Company's financial results for the third quarter of 2022, during which Defendant Coleman stated that "[i]n the life insurance operations, premium revenue increased 4% from the year-ago quarter to $755 million. Life underwriting margin was $208 million, up 28% from the year ago." Additionally, Defendant Hutchison stated that "[l]ooking at the quarter, at [AILIC], life premiums were up 6% over the year-ago quarter to $378 million, and life underwriting margin was up 16% to $128 million. . . . In the third quarter of 2022, net life sales were $76 million, up 4%."

72.     On November 8, 2022, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended September 30, 2022 ("3Q22 Report"). The 3Q22 Report was signed by Defendants Coleman, Hutchison, and Svoboda, and contained certifications by Defendants Coleman, Hutchison, and Svoboda, attesting to the purported accuracy and completeness of the report. The 3Q22 Report stated that, for third quarter of 2022, Globe Life's life insurance premium revenue was $755 million, and for the nine-month period ended September 30, 2022, "[t]otal net sales increased 4% to $539 million, when compared with 2021." For AILIC specifically, Globe Life stated that, for the nine-month period ended September 30. 2022, AILIC's life insurance premium revenue was $1.12 billion, and "[n]et sales

increased 14% to $247 million during the first nine months of 2022 compared with $217 million in 2021 for the same period."

73.    On February 2, 2023, Globe Life held its earnings call to discuss the Company's financial results for fourth quarter and full year 2022, during which Defendant Svoboda stated that "[i]n the life insurance operations, premium revenue for the fourth quarter increased 3% from the year-ago quarter to $754 million. The full-year 2022 premium income grew 4%. . . . Life underwriting margin was $212 million, up 45% from a year ago." Additionally, Defendant Darden stated that, for AILIC, "life premiums were up 5% over the year-ago quarter to $381 million, and life underwriting margin was up 27% to $130 million."

74.    On February 23, 2023, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC for the reporting period ended December 31, 2022 ("2022 10-K"). The 2022 10-K was signed by Defendants Darden, Svoboda, Kalmbach, Henrie, Addison, Alston, Brannen, Hutchison, Johnson, Alexander, Blinn, Buchan, Coleman, Ingram, Rebelez, and Thigpen. The 2022 10-K reported that "[t]otal net sales increased 2% . . . from $706 million in 2021 to $722 million in 2022." According to the annual report, for full year 2022, Globe Life's life insurance underwriting margin was $769 million, and for full year 2022 for AILIC specifically, life insurance premium revenue was $1.5 billion, and "[n]et sales increased 9% to $317 million in 2022 over the 2021 total of $291 million. The increase in life net sales is due to increased productivity plus an improvement in issue rates[.]"

75.    On May 4, 2023, Globe Life held its earnings call to discuss the Company's financial results for the first quarter of 2023, during which Defendant Svoboda stated that "[i]n life insurance operations, premium revenue for the first quarter increased 3% from the year-ago quarter to $773 million. . . . Life underwriting margin was $291 million, up 1% from a year ago."

Case 4:24-cv-00993-SDJ   Document 1   Filed 11/07/24   Page 23 of 32 PageID #:  23

Additionally, Defendant Darden stated that, at "[a]t [AILIC], life premiums were up 5% over the year-ago quarter to $388 million, and life underwriting margin was up 2% to $176 million."

76.     On May 9, 2023, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended March 31, 2023 ("1Q23 Report").  The 1Q23 Report was signed by Defendants Darden, Svoboda, and Kalmbach, and contained certifications by Defendants Darden, Svoboda, and Kalmbach attesting to the purported accuracy and completeness of the report.  The report stated, for the first quarter of 2023, Globe Life's life insurance premium was $773 million, and "[t]otal net sales increased 5% to $190 million, when compared with 2022."  For the first quarter of 2023 for AILIC specifically, Globe Life reported AILIC's life insurance premium revenue was $388 million.

77.     On July 27, 2023, Globe Life held its earnings call to discuss the Company's financial results for the second quarter of 2023, during which Defendant Svoboda stated "[i]n our life insurance operations, premium revenue for the second quarter increased 3% from the year-ago quarter to $782 million."  Additionally, Defendant Darden stated that at AILIC, "life premiums were up 5% over the year-ago quarter to $395 million, and life underwriting margin was up 2% to $180 million."

78.     On August 8, 2023, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended June 30, 2023 ("2Q23 Report").  The 2Q23 Report was signed by Defendants Darden, Svoboda, and Kalmbach, and contained certifications by Defendants Darden, Svoboda, and Kalmbach attesting to the purported accuracy and completeness of the report.  The report stated, for the second quarter of 2023, Globe Life's life insurance premium revenue was $782 million, and "[t]otal net sales increased 4% over the same period in the prior year from $366 million in 2022 to $379 million in 2023."  For AILIC

specifically, Globe Life stated, for the six-month period ended June 30, 2023, AILIC's life insurance premium was $782 million.

79.    On October 26, 2023, Globe Life held its earnings call to discuss the Company's financial results for the third quarter of 2023, during which Defendant Svoboda stated that "[i]n our life insurance operations, premium revenue for the third quarter increased 4% from the year-ago quarter to $788 million. . . . Life underwriting margin was $300 million, up 21% from a year ago." Additionally, Defendant Darden stated that at AILIC, "life premiums were up 6% over the year-ago quarter to $400 million and the life underwriting margin was up 8% to $181 million. In the third quarter of 2023, net life sales were $81 million, which is up 6% from the year-ago quarter, primarily due to growth in agent count."

80.    On November 6, 2023, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the reporting period ended September 30, 2023 ("3Q23 Report"). The 3Q23 Report was signed by Defendants Darden, Svoboda, and Kalmbach, and contained certifications by Defendants Darden, Svoboda, and Kalmbach attesting to the purported accuracy and completeness of the report. The 3Q23 Report stated, for the third quarter of 2023, Globe Life's life insurance premium revenue was $788 million, and for the nine-month period ended September 30, 2023, "[t]otal net sales increased 5% to $568 million, when compared with 2022." For AILIC specifically, Globe Life stated, for the nine-month period ended September 30, 2023, AILIC's life insurance premium revenue was $1.18 billion, and "[n]et sales were $81 million for the three months ended September 30, 2023, up from $76 million in the year-ago period."

81.    On February 8, 2024, Globe Life held its earnings call to discuss the Company's financial results for fourth quarter and full year 2023, during which Defendant Svoboda stated that

"[i]n our life insurance operations, premium revenue for the fourth quarter increased 4% from the year-ago quarter to $795 million. Life underwriting margin was $305 million, also up 4% from a year ago." Additionally, Defendant Darden stated that "[a]t [AILIC], life premiums were up 7% over the year-ago quarter to $406 million, and life underwriting margin was up 5% to $183 million. In the fourth quarter of 2023, net life sales were $76 million, up 9% from a year ago, primarily due to growth in agent count."

82.     Also during the fourth quarter and full year 2023 earnings call, Defendant Darden addressed "articles related to litigation pending in arbitration against [AILIC] and one of its state general agents."  The articles reported a "tawdry, drug-fueled, violent world" at AILIC where women were "fed date rape drugs, compared to dog puke, and forced to watch a boss masturbate." Defendant Darden described the Company's actions since purportedly hearing of the articles' allegations, stating, in relevant part:

> [A]s soon as American Income became aware of the agent's allegations, the Company engaged an external third party to conduct an impartial and thorough investigation. American Income took prompt and appropriate action based on that investigation. We continue to vigorously dispute and defend against the allegations made about American Income Life in this litigation. . . . We take seriously any allegations brought to our attention concerning harassment, inappropriate conduct, or unethical business practices, and we do not tolerate such behavior.

83.     On February 28, 2024, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC for the reporting period ended December 31, 2023 ("2023 10-K").  The 2023 10-K was signed by Defendants Darden, Svoboda, Kalmbach, Henrie, Addison, Alston, Brannen, Cho, Rodriguez, Alexander, Blinn, Buchan, Johnson, and Thigpen. The 2023 10-K reported that "[t]otal net sales increased 6% over the same period in the prior year from $722 million in 2022 to $768 million in 2023."  For AILIC specifically, the 2023 10-K stated that, for full year 2023, AILIC's life insurance premium revenue was $1.59 billion, and "[n]et sales were $323 million in 2023, up from $317 million in 2022."

84.    The above statements and financial information issued by the Individual Defendants were materially misleading because they failed to disclose that: (i) the largest producing AILIC sales teams were engaging in rampant insurance and recruiting fraud and maintained unsafe working environments; (ii) AILIC management was purportedly aware of and failed to respond to or remediate these issues; (iii) the Company was under investigation by government agencies in connection with sales practices of AILIC agents; and (iv) as a result, the Company faces a substantial likelihood of significant liabilities in connection with private and government actions.

### C.    The Truth Emerges

85.    On April 11, 2024, Fuzzy Panda Research ("Fuzzy Panda") published a report (the "Fuzzy Panda Report") alleging that it "uncovered extensive allegations of insurance fraud ignored by management despite being obvious and reported hundreds of times." (Underline in original). Specifically, the Fuzzy Panda Report stated that, among other things, agents were forging customer signatures to create policies those customers never agreed to purchase or to enhance existing customer policies without customers' consent.

86.    The Fuzzy Panda Report indicated that Globe Life could qualify, in the eyes of many state regulators and the Federal Trade Commission, as an illegal multilevel marketing scheme (*i.e.*, a pyramid scheme).  According to the report, "[u]ndercover investigators were explicitly told that 'yes, you can make more money, recruiting people than selling insurance."

87.    In addition to disclosing widespread insurance and recruiting fraud perpetrated by Globe Life, the Fuzzy Panda Report revealed that AILIC "fostered an environment permissive of sexual assault, rape, racism, and widespread illicit drug activity."  On this news, the Company's stock price fell approximately 53% to close at $49.17 per share on April 11, 2024, on unusually heavy trading volume.

88.    On May 8, 2024, the Company filed its quarterly report with the SEC for the reporting period ended March 31, 2024, in which it reported that "[o]n November 30, 2023, the Company and our subsidiary, American Income Life Insurance Company, received subpoenas from the U.S. Attorney's Office for the Western District of Pennsylvania, seeking documents relating to sales practices by certain of our independent sales agents contracted to sell American Income Life Insurance Company policies."

## VI.    DAMAGES TO THE COMPANY

89.    As a direct and proximate result of the Individual Defendants' conduct, Globe Life has been seriously harmed and will continue to be.  Such harm includes, but is not limited to the following:

(a)    Any funds paid to settle the Securities Class Action;

(b)    Any regulatory or governmental penalties in connection with the allegations detailed herein; and

(c)    Costs incurred from compensation and benefits paid to the defendants who were breaching their duties to Globe Life.

90.    In addition, Globe Life's business, goodwill, and reputation with its business partners, regulators, and stockholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

91.    The actions complained of herein have irreparably damaged Globe Life's corporate image and goodwill.  For at least the foreseeable future, Globe Life will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Globe Life's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

92.    Plaintiff brings this action derivatively in the right and for the benefit of Globe Life to redress injuries suffered, and to be suffered, by Globe Life as a direct result of the wrongdoing alleged herein.  Globe Life is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93.    Plaintiff will adequately and fairly represent the interests of Globe Life in enforcing and prosecuting its rights.

94.    Plaintiff has continuously been a shareholder of Globe Life at times relevant to the wrongdoing complained of and is a current Globe Life shareholder.

95.    When this action was filed, Globe Life's Board of Directors consisted of Defendants Addison, Alexander, Alston, Blinn, Brannen, Cho, Darden, Johnson, Rodriguez, Svoboda, and Thigpen.  Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

96.    Svoboda and Darden each serve as co-CEO of the Company and therefore are not independent under NYSE listing rules.  As Globe Life employees, Svoboda and Darden derive substantially all of their income from their employment.  Therefore, they could not disinterestedly consider a demand for action that might require them to sue the directors that control their continued employment and/or their fellow members of management with whom they work on a day-to-day basis.  Svoboda and Darden are also named as defendants in the Securities Class Action.  As a result, demand is futile as to each of them.

97.    The entire Board is charged with overseeing the Company's affairs, including Globe Life's AILIC subsidiary.  Because AILIC accounts for 50% of the Company's underwriting margin, the entire Board knew or should have known of the material facts concerning this business, including the widespread insurance and recruiting fraud rampant at this business.  In their

capacities as directors, Addison, Alexander, Alston, Blinn, Brannen, Cho, Darden, Johnson, Rodriguez, Svoboda, and Thigpen issued materially misleading statements, including the Form 10-Ks for the 2019 through 2023 fiscal years, and face a substantial likelihood of liability and demand is excused on that basis.

98.    According to the Company's 2024 proxy statement, the entire Board is responsible for overseeing the Company's ESG initiatives and reporting.  As a result, the entire Board knew or should have known that assertions in the Company's ESG reports were misleading and inaccurate but allowed them to be issued anyhow.  Addison, Alexander, Alston, Blinn, Brannen, Cho, Darden, Johnson, Rodriguez, Svoboda, and Thigpen face substantial likelihood of liability in connection with the misleading ESG reports and demand is excused on that basis as well.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

99.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.    The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Globe Life's business and affairs, particularly with respect to issues as fundamental as public disclosures.

101.    The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Globe Life.

102.    In breach of their fiduciary duties owed to Globe Life, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

103.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report the Company's overall prospects.

104.    As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, Globe Life has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Globe Life, demands judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Globe Life and that Plaintiff is an adequate representative of the Company;

B.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties;

C.    Directing Globe Life to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Globe Life and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Globe Life's oversight of its disclosure procedures; and

4.      a provision to permit the stockholders of Globe Life to nominate at least three candidates for election to the Board;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Globe Life has an effective remedy;

E.      Awarding to Globe Life restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: November 7, 2024.                                       Respectfully submitted,

CONDON TOBIN SLADEK THORNTON
  NERENBERG PLLC

 /s/ Stuart L. Cochran
Stuart L. Cochran
State Bar No. 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231

Telephone: (214) 265-3804
Facsimile: (214) 691-6311
Email: scochran@condontobin.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (*pro hac vice*)
Erica Stone (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: estone@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
745 Fifth Avenue, 5th Floor
New York, NY 10151
Telephone: (212) 935-7400
Facsimile: (212) 756-3630
Email: bsachsmichaels@glancylaw.com

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: prajesh@glancylaw.com

**ATTORNEYS FOR PLAINTIFF JUI CHENG HSIAO**