# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE GLOBE LIFE INC. f/k/a | § | |
| TORCHMARK CORPORATION | § | Civil Action No. 4:24-cv-993 |
| STOCKHOLDER DERIVATIVE | § | Judge Mazzant |
| LITIGATION | § | **LEAD** |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are two competing leadership motions. Having considered the motions and the relevant pleadings, the Court finds that:

1. Plaintiff Plymouth County Retirement Association's Motion to Appoint Plymouth County Retirement Association as Lead Plaintiff and to Revise Appointment of Lead Counsel Pursuant to Fed. R. Civ. P. 23.1 (Dkt. #23) should be **GRANTED** as set forth herein; and

2. Plaintiff Catherine M. Sugarbaker Family Trust's Motion to Vacate Current Leadership Structure and Appoint New Co-Lead Counsel for Plaintiffs (Dkt. #29) should be **DENIED** as set forth herein.

## BACKGROUND

This consolidated shareholder derivative suit arises from alleged misconduct on behalf of a company's board of directors and its executive officers.[1] Several plaintiffs brought suit on behalf of the nominal defendant, Globe Life Inc. f/k/a Torchmark Corporation ("Globe Life"). Competing plaintiffs and their law firms—each qualified to litigate the case—seek leadership roles.

At an early stage, the Court granted an unopposed motion appointing the Rosen Firm, P.A. ("Rosen") and Glancy Prongay & Murray LLP ("GPM") to serve as co-lead counsel (Dkt. #4). Since then, several other law firms have thrown their hats in the ring, asking the Court to consider its leadership structure anew.

---

[1] Following the Court's January 3, 2025 and January 8, 2026 Orders, the following cases were consolidated into the lead case: 4:25-cv-1246, 4:25-cv-1274, 4:25-cv-993, and 4:24-cv-1011 (Dkt. #4; Dkt. #18).

Plaintiff Plymouth County Retirement Association ("Plymouth") asks the Court to name Scott+Scott Attorneys at Law LLP ("Scott+Scott") and Bleichmar Fonti & Auld LLP ("BFA") as sole co-lead counsel (Dkt #23). Plymouth also asks that the Court appoint Steckler Wayne & Love PLLC as liaison counsel. Additionally, Plymouth requests to be the lead plaintiff in the case.

Plaintiff The Catherine M. Sugarbaker Family Trust ("Sugarbaker") has its own preferences. In Sugarbaker's view, Robbins LLP ("Robbins") and Sbaiti & Company PLLC ("Sbaiti") should be co-lead counsel (Dkt. #29). Sugarbaker does not address liaison counsel. As to the lead plaintiff position, Sugarbaker argues that a lead plaintiff is not required, but that the Court should name Sugarbaker if the Court does choose to appoint one.

Following Sugarbaker's motion, Plymouth filed a response in further support of its proposed leadership structure (Dkt. #34). Plaintiff Jui Cheng Hsiao ("Hsiao") (Rosen and GPM's client) filed a response to both Plymouth and Sugarbaker's motions (Dkt. #37). There, Hsiao argued that changes to the existing leadership structure are unwarranted, and that a lead plaintiff is unnecessary. Sugarbaker also filed a response to Plymouth's motion (Dkt. #39).

Shortly thereafter, Plymouth requested a hearing (Dkt. #42). On March 25, 2026, the Court held the hearing and considered arguments from Hsiao, Plymouth, and Sugarbaker about the competing leadership motions. Since then, Hsiao and Sugarbaker joined forces. On April 10, 2026, they jointly proposed that Robbins and Sbaiti (counsel for Sugarbaker) serve as co-lead counsel, and that GPM and Rosen (Hsiao's counsel and current co-lead counsel) serve on an executive committee (Dkt. #59). Plymouth responded and objected to the proposal (Dkt. #60).

The leadership motions are now ripe for adjudication.[2]

---

[2]   Defendants have not expressed any preference regarding the leadership structure.

## LEGAL STANDARD

The Court, "if it sees fit, may appoint one or more attorneys as liaison counsel, lead counsel, or trial counsel for . . . consolidated cases and can assign the designated lawyers specific responsibilities." *Weller v. Wilkinson*, No. CV 19-1723-MN-JLH, 2020 WL 2514079, at \*2 (D. Del. May 15, 2020) (citation modified). "The selection of lead counsel in a shareholder derivative action filed in federal court is left to the sound discretion of the Court." *KBC Asset Mgmt. NV ex rel. Chemed Corp. v. McNamara*, 78 F. Supp. 3d 599, 607 (D. Del. 2015); *see In re Wendy's Co. S'holder Derivative Action*, 44 F.4th 527, 532 (6th Cir. 2022) ("[T]he selection of lead counsel is one of the means by which a district court, through its inherent power, manages proceedings.").

The Court also has the discretion to appoint lead plaintiffs in a shareholder derivative suit. *In re Comverse Tech., Inc. Derivative Litig.*, No. 06-CV-1849 (NGG)(RER), 2006 WL 3761986, at \*1 (E.D.N.Y. Sept. 22, 2006), *objections overruled*, No. 06-CV-1849 (NGG)(RER), 2006 WL 3511375 (E.D.N.Y. Dec. 5, 2006). Appointing a lead plaintiff is not required by statute in a derivative suit, but "derivative actions must comply with Rule 23.1 of the Federal Rules of Civil Procedure, which requires . . . that a plaintiff in a derivative action 'fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association.'" *Id.* (quoting FED. R. CIV. P. 23.1(a)).

The central goal of the appointment of lead counsel or lead plaintiffs is to "appoint the representative who will best serve the interests of the corporation and its shareholders and most effectively prosecute the litigation." *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1151 (Del. 2011).

## ANALYSIS

The Court must determine what leadership structure would best serve the interests of Globe Life and its shareholders. To do so, the Court will first outline the factors that will guide its decision. Then, the Court will apply the factors to evaluate the competing applications. Although it is a close call, the Court ultimately concludes that Plymouth presents the superior application.

### I.    What Factors Should the Court Consider When Appointing Lead Counsel?

There is no statutory authority setting forth the criteria the Court must apply when appointing lead counsel in a shareholder derivative suit. *In re Comverse Tech., Inc. Derivative Litig.*, 2006 WL 3761986, at *2; 2 MCLAUGHLIN ON CLASS ACTIONS § 9:13, Westlaw (database updated Nov. 2025) ("Unlike the existence of statutory authority under the Private Securities Litigation Reform Act . . ., under the federal rule there is no statutory or rule-based authority for appointment of a lead plaintiff or counsel in a shareholder derivative action."). Indeed, the parties do not cite (nor has the Court independently located) binding precedent setting forth such criteria.

In the Court's view, the factors outlined in Delaware Court of Chancery Rule 23.1 are comprehensive and adequately capture the criteria developed in the case law to guide the appointment of lead counsel. Therefore, the Court will consider the following factors:

(i) counsel's competence and experience;

(ii) counsel's access to the resources necessary to prosecute the litigation;

(iii) the quality of the pleading;

(iv) counsel's performance in the litigation to date;

(v) the proposed leadership structure;

(vi) the derivative plaintiff's relationship to and interest in the entity;

(vii) any conflicts between counsel or the derivative plaintiff and the entity; and

4

(viii) any other matter pertinent to ability of counsel or the derivative plaintiff to fairly and adequately represent the interests of the entity in the derivative action.

DEL. CT. CH. R. 23.1(c)(3)(A).

## II.    What Leadership Structure Would Best Represents the Interests of Globe Life?

Plaintiffs presented the Court with two leadership structures: Plymouth's proposed structure and Sugarbaker/Hsiao's proposed structure. The Court finds that either structure would adequately represent the interests of Globe Life and its shareholders. Thus, the Court proceeds to examine which structure would best represent those interests.

### A.    Counsel's Competence and Experience

Although all law firms that threw their hats in the ring are well-qualified to prosecute this lawsuit, this factor favors Plymouth's proposed leadership structure. Here, each complaint in the case asserts at least one *Caremark* oversight claim.[3] As co-lead counsel, Scott+Scott recently secured a mid-trial settlement for $190 million in the first *Caremark* oversight claim to make it to trial in Delaware history.[4] The Court gives weight to this achievement because, "[a]s often stated, oversight liability under *Caremark* is possibly the most difficult theory in corporation law upon which a plaintiff might hope to get a judgment." *Firemen's Ret. Sys. of St. Louis ex rel. Marriott Int'l, Inc. v. Sorenson*, No. CV 2019-0965-LWW, 2021 WL 4593777, at *11 (Del. Ch. Oct. 5, 2021) (citation modified). The Court finds that this unique achievement puts Scott+Scott's track record above that of its competitors. But because all firms have demonstrated they are competent and experienced enough to prosecute the case, the Court gives only moderate weight to this factor.

---

[3]  In *In re Caremark Int'l Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996), the Delaware Court of Chancery considered the legal standard governing a board of directors' duties to supervise or monitor corporate performance.

[4]  Ellen Bardash, Chancellor Approves $190M Settlement, $53M Fee Award in Facebook User Privacy Case, Law.com (April 8, 2026), https://www.law.com/delbizcourt/2026/04/08/chancellor-approves-190m-settlement-53m-fee-award-in-facebook-user-privacy-case/?slreturn=20260413113627.

**B.**    **Counsel's Access to the Resources Necessary to Prosecute the Litigation**

This factor is neutral because the Court has no reason to question that each firm has the necessary resources to prosecute this litigation.

**C.**    **The Quality of the Pleadings**

This factor slightly favors Sugarbaker. Sugarbaker's victory is only slight in degree because Plymouth and Sugarbaker's critiques primarily center on tactical decisions. For example, during oral argument, Sugarbaker questioned Plymouth's decision to assert both an information-systems *Caremark* claim and a red-flag claim, and Plymouth questioned Sugarbaker's decision to pursue only one.[5] The case law recognizes that the two claims often stand "in tension," *Giuliano v. Grenfell-Gardner*, No. 2021-0452-KSJM, 2025 WL 2502176, at *11 (Del. Ch. Sept. 2, 2025)—but they can coexist. *Ont. Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, No. 2021-0827-JTL, 2023 WL 3093500, at *32 (Del. Ch. Apr. 26, 2023) ("Simultaneously advancing both a Red-Flags Claim and an Information-Systems Claim can seem counterintuitive . . . . But that will not always be so."). This debate shows only that "each counsel views the case differently or has made tactical decisions on the best course for litigation." *In re Comverse*, 2006 WL 3761986, at *4.

The more difficult question is whether Sugarbaker correctly argues that its complaint is the most likely to overcome the "formidable standard for demand futility." *In re Facebook, Inc. Derivative Litig.*, No. CV 2018-0307, 2021 WL 4552158, at *3 (Del. Ch. Oct. 5, 2021). "A cardinal precept" of Delaware law is "that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other*

---

[5]    For an explanation of the two types of claims and their origins, see *In re McDonald's Corp. Stockholder Derivative Litigation*, 289 A.3d 343, 359 (Del. Ch. 2023).

*grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).[6] The demand-futility test helps determine whether "the board should be deprived of its decision-making authority because there is reason to doubt that the directors would bring their impartial business judgment to bear on a litigation demand." *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

Sugarbaker highlights that its complaint makes specific demand-futility allegations against each director by name, while Plymouth's does not. On one hand, this argument is persuasive because the demand-futility analysis applies "on a director-by-director basis." *Id.*

On the other hand, it is unclear whether failing to separate demand-futility allegations by director is always fatal. *See In re Chemed Corp., S'holder Derivative Litig.*, No. CV 13-1854-LPS-CJB, 2015 WL 9460118, at *11 (D. Del. Dec. 23, 2015) ("[I]f th[e] plaintiff's allegations are sufficiently particular as to the knowledge and acts of all . . . directors, the Court is not convinced that Delaware law would necessarily require the plaintiff to specifically call out each director by name throughout the Complaint in order to avoid dismissal . . . ."), *report and recommendation adopted sub nom. KBC Asset Mgmt. NV v. McNamar*a, No. CV 13-1854-LPS-CJB, 2016 WL 2758256 (D. Del. May 12, 2016).

Either way, "where a plaintiff engages in . . . group pleading, that may be an indicator that the plaintiff's allegations are unlikely to be sufficiently particularized" under the demand futility

---

[6]  Under Texas choice-of-law rules, Delaware law applies to the substantive issues in this derivative suit because Globe Life is incorporated in Delaware. *See, e.g.*, *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 822 n.5 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409 (5th Cir. 2014), *as revised* (Sept. 2, 2014). The leadership decision, however, is within the Court's inherent power. *In re Wendy's Co.*, 44 F.4th at 532.

test. *Id.* Because Sugarbaker was more careful to include director-specific allegations when alleging demand futility, the Court finds that the quality of the pleadings factor slightly favors Sugarbaker.[7]

### D.      Counsel's Performance in the Litigation to Date

This factor favors Plymouth's proposed leadership structure. To understand the Court's conclusion, it is necessary to visit a parallel proceeding in the Texas Business Court. That proceeding started when James E. Walker, Jr. ("Walker") filed suit in September 2025 (Dkt. #19-1 at p. 2). Plymouth filed a motion to intervene on November 19, 2025, seeking a stay in deference to the consolidated action before this Court (Dkt. #32 at p. 3). After Hsiao, Plymouth, and Walker briefed the issues, Judge Whitehill stayed the parallel litigation "pending the outcome of the forthcoming motions to dismiss and to stay in the first-filed consolidated federal action" (Dkt. #32-2 at pp. 3–4).

Plymouth's involvement in the parallel proceeding is notable. In Plymouth's view, Walker's petition is relatively weaker. So, if Plymouth is correct, and the petition is weak enough to be subject to dismissal, the dismissal could have preclusive effect in this Court. *See, e.g.*, *Aptim Corp. v. McCall*, 888 F.3d 129, 137–38 (5th Cir. 2018) ("If a state court's ruling would be given preclusive effect by another court of that state, then federal courts must also give preclusive effect to that ruling.").[8]

---

[7]   The Court considered all other quality of the pleadings arguments and finds them "immaterial to the Court's determination of who should be appointed lead counsel." *In re Comverse*, 2006 WL 3761986, at *4 (finding that arguments regarding the failure to bring certain substantive claims and other criticisms were not fatal and could be remedied through the filing of an amended complaint). And Plymouth's additional arguments that its pleadings are superior are insufficient to tip the scales due to the importance of satisfying demand futility under Delaware law.

[8]   The Court takes no position on whether a motion to dismiss a shareholder's derivative claims always has preclusive effect on the claims of other shareholders. *Cf. In re Fox Corp. Derivative Litig.*, 307 A.3d 979, 990–92 & n.2 (Del. Ch. 2023) (explaining that the dismissal of a shareholder derivative suit for lack of adequate representation may not have preclusive effect, but that the issue "technically . . . remains open in Delaware."). What matters for now is that Plymouth spotted the potential preclusion issue and took action.

Plymouth's intervention in the Texas Business Court litigation demonstrates that its counsel would vigorously prosecute this case.

Moreover, although both Plymouth and Sugarbaker pursued Section 220 demands[9] prior to filing suit, Plymouth acted more vigorously by filing suit in Delaware to enforce its demand and obtaining a settlement. The Court recognizes that filing suit to enforce a Section 220 demand will not always be commendable, as a premature or frivolous suit imposes unnecessary costs on the corporation. However, during oral argument, Sugarbaker did not argue that Plymouth's decision to file suit was detrimental, and the Court lacks a basis to conclude that it was. And even if the Court deemed the Section 220 issue a wash because Sugarbaker filed the demand first, Plymouth's performance has been superior because of its role in the Texas Business Court action. Thus, this factor favors Plymouth's proposed leadership structure.

### E.    The Proposed Leadership Structure

Plymouth's proposed leadership structure is superior. As a reminder, Plymouth recommends appointing Plymouth as lead plaintiff, Scott+Scott and BFA as co-lead counsel, and SWL as liaison counsel. Hsiao and Sugarbaker jointly recommend appointing Robbins and Sbaiti as co-lead counsel, and Rosen and GPW (current co-lead counsel) to an executive committee.

The record shows that Scott+Scott and BFA have previously joined forces in *In Re: The Boeing Co. Derivative Litigation*, C.A. No. 2024-1210 (Del. Ch.) and *Oklahoma Firefighters Pension & Retirement System et al. v. Calhoun, et al.*, No. 1:24-cv-01200 (E.D. Va.). Prior experience working side by side bears on whether a team can function effectively. *See In re Fox*, 307 A.3d at 993 (considering whether leadership teams previously worked together when analyzing leadership

---

9   Title 8 of the Delaware Code, Section 220 allows shareholders to inspect a corporations' books and records.

structure factor). In contrast, Sugarbaker's briefing does not specify whether and when Robbins and Sbaiti have litigated together or tell the story of how they joined forces in this case. *Cf. id.* ("While all three members of the Friedlander Team have never joined forces on a single case, the team's backstory suggests that they can function effectively.").

Additionally, although Robbins and Sbaiti have demonstrated their ability to work with Rosen and GPM (current co-lead counsel) through their joint proposal (Dkt. #59), Plymouth correctly points out that this proposal was not devised until after this matter was fully briefed and two weeks after oral argument. Plymouth also represents that its competitors did not confer with Plymouth about the joint proposal or a "a potential resolution to the pending leadership motions" (Dkt. #60 at p. 1 n.1). Under the circumstances, the Court will not consider this last-minute proposal as an indication that Sugarbaker and Hsiao's counsel would function more effectively than Scott+Scott and BFA. As a result, this factor favors Plymouth's proposed leadership structure.

### F.        The Derivative Plaintiff's Relationship to and Interest in the Entity

This factor favors Plymouth. Sugarbaker correctly observes that a lead plaintiff is not required in a shareholder derivative suit. *See, e.g.*, *In re Comverse*, 2006 WL 3761986, at *1. But courts routinely appoint lead plaintiffs anyway "in order to create an efficient case-management structure." *Freeman ex rel. Tesla, Inc. v. Musk*, 324 F.R.D. 73, 79 (D. Del. 2018) (internal quotation marks omitted) (quoting *N. Mia. Beach Gen. Emps. Ret. Fund v. Parkinson*, No. 10 C 6514, 2011 WL 12465137, at *1–2 (N.D. Ill. July 5, 2011)). Here, the Court will appoint a lead plaintiff to "create 'an efficient, streamlined structure for directing this litigation' that avoids any delays or inefficiencies resulting from disagreement over divergent viewpoints." *Id.* (quoting *KBC Asset Mgmt.*, 78 F. Supp. 3d at 603.

The question then becomes who should be lead plaintiff. Shareholder "derivative actions must comply with Rule 23.1 of the Federal Rules of Civil Procedure, which requires . . . that a plaintiff in a derivative action 'fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association.'" *In re Comverse*, 2006 WL 3761986, at *1 (quoting FED. R. CIV. P. 23.1(a)). Here, the Court has no basis to conclude that any plaintiff would be an inadequate representative.

Nevertheless, Plymouth is the only plaintiff that has identified its stock ownership in Globe Life, including when Plymouth first acquired stock. This is significant for at least two reasons. First, courts have recognized that "financial stake has some relevance to the plaintiff's interest in a derivative action and the likelihood that the plaintiff will pursue the derivative claims vigorously." *KBC Asset Mgmt.*, 78 F. Supp. 3d at 604 (citation modified). During oral argument, Sugarbaker argued that Plymouth's institutional-investor status is less significant because Plymouth's ownership stake is small when compared to Plymouth's total investments. This point would be more persuasive if Sugarbaker disclosed its own ownership stake. With no basis to conclude that Sugarbaker has a greater financial stake (whether in absolute shares or relative economic stakes), the Court cannot discount Plymouth's institutional-investor status.

Second, the Court is concerned about Sugarbaker's failure to specify when it acquired Globe Life stock. *Cf., e.g.*, *Green v. Paz*, No. CV 20-324-LPS, 2021 WL 11661345, at *4 (D. Del. Mar. 31, 2021) ("To maintain a derivative suit, the plaintiff must have owned shares in the company at the time of the disputed transaction."). The Court has no reason to assume that Sugarbaker did not own stock during the relevant time period, but Sugarbaker gives no explanation for its decision to generally allege stock ownership without specifying a date. The Court will not invent one.

11

Stock ownership issues aside, Plymouth has demonstrated its superior capability to spearhead the litigation. Plymouth is a Massachusetts public employee retirement system established in 1937, which manages pension funds for county employees and other local governmental units. It manages more than $1.5 billion in investments and has served as lead or co-lead plaintiff in securities class actions. Meanwhile, the Court possesses limited information about Sugarbaker. Its complaint provides that Sugarbaker continuously owned Globe Life stock during the wrongdoing alleged (4:24-cv-1274, Dkt. #2), but the Court lacks information on Sugarbaker's experience and capabilities. This factor therefore favors Plymouth's proposed leadership team.

### G.    Any Conflicts Between Counsel or the Derivative Plaintiff and the Entity

Plaintiffs do not identify potential conflicts, so this factor is neutral. "[H]owever, . . . even after lead counsel has been selected, the Court must continue to monitor the adequacy of counsel's representation." *In re Facebook, Inc.*, 2021 WL 4552158, at *5. Thus, "[s]hould any potential conflicts arise, the Court can make necessary adjustments at that time, if needed." *Id.*

\* \* \*

Here, "[d]eciding between the competing leadership applications is difficult." *In re Fox*, 307 A.3d at 998. But after considering the factors holistically, the Court finds that Plymouth presented the better leadership application.

### CONCLUSION

It is therefore **ORDERED** that Plaintiff Plymouth County Retirement Association's Motion to Appoint Plymouth County Retirement Association as Lead Plaintiff and to Revise Appointment of Lead Counsel Pursuant to Fed. R. Civ. P. 23.1 (Dkt. #23) is hereby **GRANTED** as set forth herein.

It is further **ORDERED** that Plaintiff Catherine M. Sugarbaker Family Trust's Motion to Vacate Current Leadership Structure and Appoint New Co-Lead Counsel for Plaintiffs (Dkt. #29) is hereby **DENIED** as set forth herein.

It is further **ORDERED** that the leadership structure and leadership responsibilities set forth in the Court's January 3, 2025 Order (Dkt. #4) are **VACATED**. The Court's consolidation directives from the January 3, 2025 Order (Dkt. #4) remain in full force.

It is further **ORDERED** that Plymouth County Retirement Association is appointed sole Lead Plaintiff.

It is further **ORDERED** that Scott+Scott Attorneys at Law LLP and Bleichmar Fonti & Auld LLP are appointed sole Co-Lead Counsel.

It is further **ORDERED** that Co-Lead Counsel shall be generally responsible for coordinating the activities of plaintiffs during pretrial proceedings and shall:

(a) determine (in consultation with Liaison Counsel) and present (in briefs, oral argument, or such other fashion as may be appropriate, personally or by a designee) to the Court and opposing parties the position of the plaintiffs on all matters arising during pretrial proceedings;

(b) coordinate the initiation and conduct of discovery on behalf of plaintiffs consistent with the requirements of FED. R. CIV. P. 26(b)(1), 26(2), and 26(g), including the preparation of joint interrogatories and requests for production of documents and the examination of witnesses in depositions;

(c) conduct settlement negotiations on behalf of plaintiffs, but not enter binding agreements except to the extent expressly authorized;

(d) delegate specific tasks to other counsel or committees of counsel, as authorized by the Court, in a manner to ensure that pretrial preparation for the plaintiffs is conducted efficiently and effectively;

(e) enter into stipulations with opposing counsel as necessary for the conduct of the litigation;

(f) prepare and distribute periodic status reports to the parties;

(g) maintain adequate time and disbursement records covering services as lead counsel;

(h) monitor the activities of cocounsel to ensure that schedules are met and unnecessary expenditures of time and funds are avoided; and

(i) perform such other duties as may be incidental to proper coordination of plaintiffs' pretrial activities or authorized by further order of the Court.

Counsel for plaintiffs who disagree with lead counsel (or those acting on behalf of lead counsel) or who have individual or divergent positions may present written and oral arguments, conduct examinations of deponents, and otherwise act separately on behalf of their clients as appropriate, provided that in doing so they do not repeat arguments, questions, or actions of lead counsel.

It is further **ORDERED** that Steckler Wayne & Love PLLC is appointed sole Liaison Counsel.

It is further **ORDERED** that Liaison Counsel shall:

(a) maintain and distribute to cocounsel an up-to-date service list;

(b) receive and, as appropriate, distribute to cocounsel orders from the court;

(c) maintain and make available to cocounsel at reasonable hours a complete file of all documents served by or upon each party.

14

It is further **ORDERED** that plaintiffs' counsel shall meet and confer and submit a proposed schedule for the filing of a consolidated complaint, or the designation of an operative complaint, within **fifteen days** of the entry of this Order.

It is further **ORDERED** that the parties shall meet and confer regarding a schedule for Defendants' responses to the consolidated complaint or designated operative complaint within **thirty days** of the entry of this Order.

It is further **ORDERED** that every filing in this Consolidated Derivative Action shall bear the following caption:

| | | |
|---|---|---|
| IN RE GLOBE LIFE INC. f/k/a | § | |
| TORCHMARK CORPORATION | § | Civil Action No. 4:24-cv-993 |
| STOCKHOLDER DERIVATIVE | § | Judge Mazzant |
| LITIGATION | § | **LEAD** |

**IT IS SO ORDERED.**

**SIGNED this 17th day of April, 2026.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE